IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DAVID C. GEVAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CV-134-NJR-DGW |
| | ) | |
| DR. ROBERT SHEARING, | ) | |
| WEXFORD HEALTH SOURCES, INC. | ) | |
| JEREMY BUTLER, | ) | |
| RONALD SKIDMORE, | ) | |
| NICKI MALLEY, KIMBERLY BUTLER, | ) | |
| and RICHARD HARRINGTON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Now pending before the Court is the Motion for Summary Judgment filed by Defendants Jeremy Butler, Robert Shearing, and Wexford Health Sources Inc. ("Wexford"), on June 12, 2015 (Doc. 213).

### INTRODUCTION

Plaintiff David Gevas, an inmate in the Illinois Department of Corrections at Stateville Correctional Center, filed a *pro se* civil rights action pursuant to 42 U.S.C. § 1983 on February 6, 2014. Plaintiff alleged that he was temporarily transferred to Menard Correctional Center for two weeks in August and September 2013, and during that time, he was deprived of various prescription medications and other items, including Neurontin for chronic pain in his left leg, Motrin for chronic pain in his left shoulder, Flomax for an enlarged prostate and urination problems, Blink lubricating eye

drops, multi-purpose solution for contact lenses, and a contact lens case. Plaintiff further alleged that as a result of these deprivations he suffered pain in his leg and shoulder, nausea, vomiting, insomnia, muscle jerking, frequent and uncontrollable urination, headaches, and the inability to see. He claimed that he made written and verbal requests for the items and to see a doctor, but those requests were denied by Defendants Jeremy Butler and Ronald Skidmore, who are both nurses at Menard. He further claimed that his grievances and complaints were ignored by Defendant Nicki Malley, the Health Care Unit Administrator; Kimberly Butler, the Assistant Warden; and Richard Harrington, the Warden. Plaintiff believes that the medications were denied in retaliation for a previous lawsuit and in an effort by Defendant Wexford to save money. Plaintiff also believes that a portion of any money saved was funneled to Defendant Robert Shearing, a doctor at Menard.

The Court conducted a threshold review of Plaintiff's complaint under 28 U.S.C. § 1915A (Doc. 5). Following that review, Plaintiff was permitted to proceed on six counts:

> **Count 1:** Eighth Amendment deliberate indifference claim against Defendants J. Butler, Skidmore, Malley, Shearing, K. Butler, and Harrington for refusing to provide Plaintiff with previously-prescribed medications and denying him access to a doctor;
>
> **Count 2:** Fourteenth Amendment equal protection claim against Defendants J. Butler, Skidmore, Malley, Shearing, K. Butler, and Harrington for refusing to provide Plaintiff with prescription medications based on his status as a prisoner on temporary transfer to Menard from his home institution;
>
> **Count 3:** Eighth Amendment deliberate indifference claim and Fourteenth Amendment equal protection claim against Wexford for promulgating a policy, practice, and custom of denying prescription

medication to inmates on temporary transfer away from their home institution;

**Count 4:**   First Amendment retaliation claim against Wexford for denying Plaintiff his necessary prescription medications because he previously filed a lawsuit against Wexford;

**Count 5:**   Negligence claim under Illinois law against Defendants Malley, K. Butler, and Harrington for neglecting their duty to respond to Plaintiff's requests for prescription medications and to see a doctor;

**Count 6:**   Medical malpractice claim under Illinois law against Defendants Shearing, J. Butler, Skidmore, and Malley for refusing to provide Plaintiff with his prescription medications or an examination by a doctor.

On June 12, 2015, Nurse Jeremy Butler, Dr. Robert Shearing, and Wexford filed their motion for summary judgment on Counts 1, 2, 3, 4, and 6 (Doc. 213). They argue that Plaintiff presents no evidence to support his claims, and they also argue that they are entitled to qualified immunity (Docs. 213, 214). After a number of extensions of time, Plaintiff finally filed his response on November 30, 2015 (Doc. 301). Defendants did not file a reply brief.

### FACTUAL BACKGROUND

This is not a comprehensive recitation of all of the facts of this case; instead, the facts are limited to those relevant to the pending motion for summary judgment. The facts are undisputed except where noted.

Plaintiff was temporarily transferred from Stateville to Menard from August 21, 2013, to September 4, 2013. The medical records show that when Plaintiff arrived at Menard on August 21st, he was screened at intake by nurses Christi Rayburn (who is not a Defendant) and Defendant Jeremy Butler (*see* Doc. 214-1, p. 1; Doc. 214-4, ¶5).

According to Plaintiff, at the time of his transfer, he had prescriptions for Neurontin, Motrin, Flomax, Depakote, Remeron, Benadryl, and Blink eye drops (*see* Doc. 214-3, p. 3). This information is corroborated by the Health Status Transfer Summary form, with two exceptions: the summary does not indicate that Plaintiff was taking Motrin, but it does indicate that he was taking an additional medication that he did not mention—Hytrin—which is used to treat prostate issues (Doc. 214-1, p. 1; Doc. 214-2, ¶¶5, 14).[1] Plaintiff also testified that he wore soft contacts, for which he needed solution and a case (Doc. 214-3, p. 3).

During the intake assessment, Plaintiff first saw Nurse Butler (Doc. 214-3, p. 8). Nurse Butler states that he performed the "psychiatric portion of the intake assessment" (Doc. 214-4, ¶5). However, there are no notes on the transfer summary from Nurse Butler (*see* Doc. 214-1, p. 1). There is also no other document in the record that reflects Nurse Butler's contact with Plaintiff on August 21st (*see* Doc. 214-1). But it is undisputed that there was contact (*see* Doc. 214-3, p. 8; Doc. 214-4). Plaintiff testified at his deposition that he told Nurse Butler what medications he was taking, including the dosages, and told him that he was wearing contact lenses and needed solution and eye drops (Doc. 214-3, pp. 5–6).

Plaintiff then saw Nurse Rayburn, who performed the physical examination portion of the intake assessment (*see* Doc. 214-1, p. 1; Doc. 214-3, p. 8). She noted on the transfer summary that Plaintiff was oriented, his physical appearance was appropriate,

---

[1] While the intrasystem transfer summary form indicates what medications Plaintiff was taking, it does not indicate what conditions those medications were prescribed to treat (*see* Doc. 214-1, p. 1). It seems to the Court that an inmate's current and chronic medical issues and conditions is the type of information that should *always* be included in the transfer summary.

he was wearing his contacts, and he had no complaints of pain or discomfort (*Id.*). Plaintiff testified that he told Nurse Rayburn about the medications he was taking (Doc. 214-3, p. 8). She referred Plaintiff to be seen at a nurse sick call (Doc. 214-1, p. 1).

Once the intake assessment was completed, a nurse contacted Dr. Robert Shearing, the Medical Director at Menard (Doc. 214-2, ¶9). Dr. Shearing prescribed Hytrin, Remeron, Depakote, and Benadryl for Plaintiff (Doc. 214-1, p. 20; Doc. 214-2, ¶9). Dr. Shearing did not re-prescribe the Neurontin, Motrin, Flomax, or the Blink eye drops. He also did not provide Plaintiff with contact solution or a case.[2] Plaintiff testified that he had been taking Neurontin for "quite some time" for pain in his left leg caused by a nerve issue in his back (Doc. 214-3, pp. 3, 4, 5). Plaintiff took the Motrin for pain in his left shoulder that stems from being stabbed in 2008 (*Id.* at p. 6). Plaintiff took the Flomax for an enlarged prostate (*Id.* at p. 7). And he needed the eye drops in order to wear his contacts for the required amount of time, and the solution and case to store his contacts at night (Doc. 5).

As Dr. Shearing tells it, "[m]edications from prior correctional centers are not 'automatically' renewed or continued upon arrival at a new facility" (Doc. 214-2, ¶15). Instead, according to a Wexford official, "the decision whether to renew, discontinue, or charge medications when an inmate is transferred is left to the professional discretion of the treating physician at the new facility" (Doc. 214-5, ¶8). Dr. Shearing explains that "painkillers, especially more potent ones like Neurontin . . . will only be re-prescribed"

---

[2] There is no indication in the record as to how inmates are supposed to obtain contact solution and a contact case at Menard. More specifically, it is not clear whether a doctor must order those supplies. Plaintiff seems to think that a doctor must prescribe them. And, in fact, his medical records show that a contact case was prescribed to him by a physician after he returned to Stateville (Doc. 214-1, p. 22). Dr. Shearing does not dispute that he is the individual responsible for providing contact solution and a contact case to inmates who need them at Menard (*see* Doc. 214-2).

after the inmate has been evaluated by a doctor to ensure that the medication and dosage are still appropriate and the medication is not being abused or misused (Doc. 214-2, ¶¶15, 16). It is undisputed that Plaintiff did not receive Neurontin for his leg pain during his entire stay at Menard. Plaintiff testified that the Neurontin reduced his leg pain to a one or a two; without it, his pain was between a seven and a ten (Doc. 214-3, p. 4).

As for the Flomax, Dr. Shearing explains that Flomax and Hytrin are similar medications with very similar effects; they are both used to treat prostate issues (Doc. 214-2, ¶¶5, 14). At the time, Hytrin was on the prescription formulary, but Flomax was not (*Id.* at ¶14). Therefore, barring a reason for using Flomax over Hytrin, Hytrin would have been prescribed because there is "a preference for utilizing formulary medications over non-formulary medications" (*Id.*). The Hytrin was dispensed to Plaintiff for the first time on August 23rd (Doc. 214-1, p. 13). Plaintiff testified that he immediately gave it back because he had previously been on Hytrin and it did not work (Doc. 214-3, p. 7). Dr. Shearing claims that he did not have access to Plaintiff's entire medical chart because only a short version is sent upon transfer, so he did not know that Hytrin was previously ineffective for Plaintiff (Doc. 214-2, ¶ 12). The Hytrin was never dispensed to Plaintiff again, and there is no indication that Plaintiff received Flomax or any other drug to treat his prostate issues during his entire stay at Menard (*see* Doc. 214-1, pp. 13–16). Without the Flomax, Plaintiff testified that he frequently urinated and could not fully empty his bladder, which led to painful straining in an attempt to force the urine out and urine dribbling onto his clothes after he finished going to the bathroom (Doc. 214-3, p. 7). Plaintiff further testified that he experienced "a lot of frustration, hopelessness, and

helplessness" (*Id.*).

Dr. Shearing presumably did not re-prescribe Motrin to Plaintiff because it was not listed as one of Plaintiff's current medications on the transfer summary (*see* Doc. 214-1, p. 1). Plaintiff was nevertheless able to obtain a blister pack of Motrin on August 24th from Nurse Ronald Skidmore (Doc. 214-3, p. 6; Doc. 301-3, p. 13). Taking his normal prescription dosage, Plaintiff ran through the Motrin in about three days, and he was not given any more (Doc. 214-3, p. 6). Without the Motrin, Plaintiff rated his shoulder pain between a seven and a ten, and stated that he had difficulty sleeping and showering (*Id.*).

Dr. Shearing did not provide an explanation as to why he did not re-prescribe the eye drops (*see* Doc. 214-2.). Another physician eventually prescribed the eye drops on August 28th, but Plaintiff claims that he never received them (Doc. 214-2, ¶6; Doc. 214-1, p. 20; Doc. 214-3, p. 10). Plaintiff's claim is corroborated by the medication administration records, which do not indicate that the eye drops were ever dispensed to Plaintiff (Doc. 214-1, pp. 13, 15).

Finally, Dr. Shearing states that he did not provide Plaintiff with contact solution or a contact case because he was unaware that Plaintiff wore contacts (Doc. 214-2, ¶18). It is undisputed that Plaintiff never received solution or a case during his entire stay at Menard. Plaintiff testified that he left his contacts in as long as he could, but he eventually had to take them out (Doc. 214-3, p. 10). Without solution and a case, the contacts dried out, and Plaintiff was unable to wear them (*Id.*). Plaintiff testified that without his contact lenses, he "suffered in pain" (*Id.* at p. 10). He further testified, "I could not see, couldn't read. I was just basically left to sit there in my cell without the

ability to read or see properly" (*Id.*).

Plaintiff believes that Dr. Shearing refused to prescribe his medications in order to save money. Specifically, Plaintiff claims that he was told by both Nurse Butler and Nurse Skidmore that Dr. Shearing has a practice of discontinuing medications, particularly non-formulary medications, prescribed at another facility in order to save money, of which he receives a percentage (Doc. 214-3, pp. 10, 16). Dr. Shearing states, however, that as the facility medical director, he "had the discretion to prescribe the medications [he] deemed most appropriate for [his] patients whether they are formulary or not" (Doc. 214-2, ¶13). He also asserts that he "did not receive a 'percentage of the money saved' by using formulary versus non-formulary medications" (*Id.* at ¶20; Doc. 214-5, ¶6). In fact, he "did not receive any kind of financial incentive for discontinuing inmate medications, utilizing less expensive medications or otherwise 'saving money' on inmate medications" (Doc. 214-2, ¶19; Doc. 214-5, ¶5).

According to Dr. Shearing, inmates were instructed to use the sick call process if they felt they needed medications other than the ones that were prescribed for them (Doc. 214-2, ¶17). "If the inmate follows the proper steps, sick call usually takes place within just a few days of arrival" (*Id.*). The medical records show that, at his initial evaluation on August 21st, Nurse Rayburn indicated that Plaintiff would be scheduled to be seen at sick call (Doc. 214-1, p. 1). The medical records also indicate that Plaintiff was seen at nurse sick call by Nurse Skidmore on August 24th, where he complained that he needed his Flomax and Neurontin (Doc. 214-1, p. 3).[3] Plaintiff also testified that

---

[3] The medical record from the sick call indicates that Plaintiff complained he needed his "Flonase, Neurontin and Tramadol" (Doc. 214-1, p. 3). Plaintiff indicated at his deposition that he asked for

he saw Nurse Butler on the night he arrived at Menard when Nurse Butler dispensed medication to him, and he asked Nurse Butler about the missing Neurontin, Motrin, Flomax, eye drops, contact solution, and contact case (Doc. 214-3, p. 9). Plaintiff further testified that he saw Nurse Butler on at least two other occasions and that each time he would "talk to him concerning, you know, what was going on, begging him, you know, to get me to see a doctor" (Doc. 214-3, p. 11–12). For his part, Nurse Butler says that he "recall[s] specifically telling [Plaintiff] that [he] would process another nurse sick call request form immediately if [Plaintiff] would fill out the form. [Plaintiff] would not fill it out. [Plaintiff] proceeded to yell at me using profane and vulgar language" (Doc. 214-4, ¶8). Plaintiff denies this exchange (Doc. 301-1, p. 8). It is undisputed that Plaintiff was never taken to the Health Care Unit or seen by a physician during the two weeks that he was at Menard (*see* Doc. 214-1).

<u>DISCUSSION</u>

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

---

"Flomax," but Nurse Sidmore mistakenly wrote down "Flonase" (Doc. 214-3, p. 16).

## A. Count 1: Deliberate Indifference

In Count 1, Plaintiff alleges that Nurse Butler and Dr. Shearing were deliberately indifferent to his medical needs when they refused to provide him with previously prescribed medications and denied him access to a doctor, causing him to suffer pain and physical discomfort, in violation of the Eighth Amendment.

In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Second, the plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *Greeno*, 414 F.3d at 653.

### 1. Serious medical need

The Seventh Circuit has defined a serious medical condition as "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). *See also Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512-513 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

Defendants concede that Plaintiff's prostate condition was a serious medical

condition (Doc. 214, p. 12). Defendants also do not dispute that Plaintiff's leg and shoulder pain constituted a serious medical need (*see id.* at pp. 15–16). Defendants do, however, dispute that Plaintiff's vision problem was serious enough for Eighth Amendment purposes (*Id.* at p. 14).

The Seventh Circuit has stated that a "need for prescription glasses could conceivably constitute a serious medical need." *Franklin v. McCaughtry*, 110 F. App'x 715, 721 (7th Cir. 2004) (citing *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996)). However, the glasses must be needed for something more than a "very slight visual impairment." *Tormasi v. Hayman*, 452 F. App'x 203, 206 (3d Cir. 2011).[4] Glasses needed for more severe visual impairments, such as significantly blurred vision, double vision, or loss of depth perception, constitutes a serious medical need.[5]

Here, Defendants argue that two weeks without contact lenses cannot rise to the level of a serious medical need because "[it] caused no pain. It caused no serious harm" (Doc. 214, p. 14). However, this argument ignores Plaintiff's testimony that, without his contacts, he "suffered in pain. [He] could not see, couldn't read. [He] was just basically left to sit there in a cell without the ability to read or see properly" (Doc. 214-3, p. 10).

---

[4] *See McIntosh v. Malueg*, Case No. 09-C-1106, 2011 WL 3684777, at *6 (E.D. Wis. Aug. 23, 2011) ("The need for glasses, especially reading glasses, is not per se a serious medical need."); *Lavin v. Hulick*, Case No. 09-CV-477-MJR, 2010 WL 2137250, *6 (S.D. Ill. May 27, 2010) (inmate failed to state a claim based on three-week deprivation of glasses when he did not allege any physical injury due to his lack of glasses; he was simply inconvenienced in that he was unable to read); *Dobbey v. Randle*, Case No. 11-CV-0146, 2013 WL 4821027, at *5 (N.D. Ill. Sept. 10, 2013) (finding that the lack of eyeglasses did not constitute serious medical condition where there was no severe impairment to inmate's ability to read, write, or see).

[5] *See Tormasi*, 452 F. App'x at 206 (inmate established serious medical need when his vision was "significantly blurred" without glasses, which caused dizziness and imbalance and resulted in injuries, including a broken jaw, from walking into objects or falling); *Koehl v. Dalsheim*, 85 F.3d 86, 87-88 (2d Cir. 1996) (inmate stated Eighth Amendment claim where he alleged that his glasses were necessary to avoid double vision and a loss of depth perception resulting from a head injury, and that without his glasses he suffers loss of vision, headaches, and injuries from falling or walking into objects); *Dobbey*, 2013 WL 4821027 at *5 ("Courts have determined that a lack of glasses results in an objectively serious medical condition when it significantly affects a prisoner's ability to see.")

Plaintiff did not give any further details, which is not entirely unexpected given that Plaintiff is a prisoner with no legal experience who is representing himself, and he did not receive any further prompting from defense counsel. For example, defense counsel could have easily asked Plaintiff how many days he went without his contacts; what, if anything, he could see without his contacts; how severe his pain was and whether it was constant or intermittent; whether he suffered from headaches, dizziness, or loss of balance; or whether he bumped into anything, fell, or otherwise injured himself because he didn't have his contacts. But defense counsel did not ask Plaintiff a single follow-up question (*see* Doc. 214-3). Defense counsel also did not submit Plaintiff's optometry records or any other documentation to shed light on the extent of Plaintiff's vision problem. Consequently, the Court is left with only Plaintiff's testimony that he suffered in pain, could not see, and could not read. This testimony is not very specific, but viewing it in a light most favorable to Plaintiff and drawing all reasonable inferences in his favor, a jury could nevertheless conclude that his vision problem was severe enough that the lack of contacts constituted a serious medical need.

In sum, a reasonable jury could find that Plaintiff's prostate problems, shoulder pain, leg pain, and the lack of contacts constituted serious medical conditions. Accordingly, the Court will consider whether Nurse Butler and Dr. Shearing acted with deliberate indifference with respect to those conditions.

### 2.  Defendant's state of mind

In order to show that prison officials acted with a sufficiently culpable state of mind, the plaintiff must put forth evidence that the prison officials knew that the

prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution.")

In order for a medical professional to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Holloway*, 700 F.3d at 1073; *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain*, 512 F.3d at 894–95). *See also Holloway*, 700 F.3d at 1073 ("There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." (quoting *Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir. 2008))).

Here, a jury could find that Nurse Butler's actions were plainly inappropriate. There is evidence that Nurse Butler knew that Plaintiff was taking Neurontin and

Flomax and needed contact supplies. There is also evidence that Nurse Butler knew Plaintiff was not receiving those medications or supplies and, as a result, Plaintiff was frustrated and in pain. Nurse Butler claims that he responded to Plaintiff's complaints by telling Plaintiff to submit a request for a sick call, but Plaintiff refused. Plaintiff denies this exchange took place. He claims Nurse Butler did not take any action and essentially ignored his complaints. This is a classic swearing contest, the resolution of which would require the Court to make credibility determinations and weigh the competing testimony. However, on summary judgment the Court cannot decide who to believe; it is up to the jury to decide whose version of events is more credible. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Consequently, Nurse Butler is not entitled to summary judgment on Count 1.

A jury could also find that Dr. Shearing's actions were plainly inappropriate. With respect to Plaintiff's prescription for Flomax, Dr. Shearing substituted the Flomax for Hytrin when Plaintiff arrived at Menard. Dr. Shearing explained that Flomax is a non-formulary drug and is only prescribed over Hytrin when there is a specific reason for doing so (Doc. 214-2, ¶14). But Dr. Shearing made no effort to discern whether there was a specific reason that Plaintiff was taking Flomax instead of Hytrin. He did not speak to Plaintiff, much less examine him; had he done so, Plaintiff undoubtedly would have informed him that Hytrin had been ineffective for him in the past. At most, Dr. Shearing reviewed "an abbreviated set" of Plaintiff's medical records, but the Court has no idea what exactly that included (*see* Doc. 214-2, ¶12). These facts, when viewed in a light most favorable to Plaintiff, suggest that Dr. Shearing made the decision to

substitute Plaintiff's Flomax with Hytrin based on little, if any, information about Plaintiff or his medical history. A reasonable jury could find that Dr. Shearing's actions surpassed mere negligence and entered the realm of deliberate indifference.

With respect to Plaintiff's prescription for Neurontin, he was taking 900 mg of Neurontin twice a day at the time of his transfer to Menard (Doc. 214-1, p. 1). It was listed as one of Plaintiff's "chronic long-term" medications, and his prescription was for a six-month supply (*Id.*). Yet when Plaintiff arrived at Menard, Dr. Shearing discontinued his prescription for Neurontin. Dr. Shearing explained that

> Medications from prior correctional centers are not "automatically" renewed or continued upon arrival at a new facility. This is particularly true with painkillers, especially more potent ones like Neurontin. . . . [P]ainkillers, particularly narcotics, will only be re-prescribed after the medical director or another physician has had an opportunity to evaluate the transferring inmate. The purpose of evaluating a patient prior to renewing or continuing a pain medication is to ensure that the specific medication and dosage are still appropriate for the patient and that the medication is not being abused or otherwise misused.

(Doc. 214-2, ¶¶15, 16).

At first blush, this explanation seems perfectly reasonable. But closer consideration raises some serious questions. First, Neurontin is not a painkiller in the traditional sense of the word, meaning it is not a narcotic or opioid pain reliever like codeine, fentanyl, hydrocodone, oxycodone, morphine, or tramadol.[6] It is not even a controlled substance.[7] Instead, it is an anti-convulsant drug used to control seizures that

---

[6] Medline Plus, *Pain Medication – Narcotics*, https://www.nlm.nih.gov/medlineplus/ency/article/007489.htm (last updated May 3, 2015).
[7] Pfizer, *Neurontin U.S. Medication Guide*, http://labeling.pfizer.com/ShowLabeling.aspx?id=630 (last updated Sept. 2015).

is also prescribed off-label for chronic, neuropathic pain.[8] Based on these facts, it is not self-evident that Neurontin has a high potential for abuse or misuse, and Defendants do not elaborate on their suggestion that it does (*see* Doc. 214).[9]

Second, it strikes the Court as odd that Dr. Shearing does not want to prescribe Neurontin until he examines an inmate, but he has no qualms about discontinuing it without ever seeing, or even speaking to, the inmate. Neurontin is not a medication that is used on an as-needed basis for run-of-the-mill aches and pains.[10] As a matter of fact, Plaintiff was taking it twice daily on a long-term basis to control his chronic pain. One would think that a physician would be reticent to abruptly stop long-term pharmaceutical treatment without any warning to the patient. That is particularly true in this instance where the labeling information for Neurontin warns that stopping the medication suddenly can cause serious adverse reactions so it should be discontinued gradually over a minimum of one week.[11]

Those concerns aside, and assuming it was appropriate for Dr. Shearing to

---

[8] Medline Plus, *Gabapentin*, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last revised July 15, 2011). Neurontin is a brand name for Gabapentin. Medline Plus, *Neuralgia*, https://www.nlm.nih.gov/medlineplus/ency/article/001407.htm (last revised July 27, 2014).

[9] Neither the Medline Plus entry for gabapentin or the Mayo Clinic's entry for gabapentin make any mention of the potential for abuse. *See* Medline Plus, *Gabapentin*, https://www.nlm.nih.gov/ medlineplus/druginfo/meds/a694007.html (last revised July 15, 2011); Mayo Clinic, *Gabapentin*, http://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/ description/drg-20064011 (last updated Dec. 1, 2015). The entry on Drugs.com indicates that Gabapentin "does not exhibit affinity for benzodiazepine, opiate . . . or cannabinoid 1 receptor sites," but "a small number of postmarketing cases report Gabapentin misuse and abuse among individuals "taking higher than recommended doses . . . for unapproved uses." Drugs.com, *Neurontin*, http://www.drugs.com/pro/ neurontin.html (last visited March 28, 2016).

[10] *See* Mayo Clinic, *Gabapentin*, http://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/ description/drg-20064011 (last updated Dec. 1, 2015).

[11] Pfizer, *Neurontin U.S. Medication Guide*, http://labeling.pfizer.com/ShowLabeling.aspx?id=630 (last updated Sept. 2015). *See also* Medline Plus, *Gabapentin*, https://www.nlm.nih.gov/medlineplus/ druginfo/meds/a694007.html (last revised July 15, 2011) ("If you suddenly stop taking gabapentin . . . you may experience withdrawal symptoms such as anxiety, difficulty falling asleep or staying asleep, nausea, pain, and sweating.")

abruptly discontinue Plaintiff's Neurontin pending an examination, he is still not entitled to summary judgment. Dr. Shearing does not dispute that he knew Plaintiff suffered from chronic pain. He discontinued Plaintiff's prescription for Neurontin but did not take any steps to address the pain that Plaintiff would undoubtedly experience without the Neurontin. For example, there is no evidence that Dr. Shearing made any effort to schedule Plaintiff for an examination or otherwise checked on Plaintiff. In fact, Dr. Shearing freely admits he never saw Plaintiff while Plaintiff was at Menard (Doc. 214-2, ¶7). There is also no evidence that Dr. Shearing provided any alternative pain reliever to Plaintiff. These facts, when viewed in a light most favorable to Plaintiff, suggest that Dr. Shearing simply left Plaintiff to suffer. A reasonable jury could very easily conclude this was a blatantly inappropriate medical decision.

As for Plaintiff's prescription eye drops, they were plainly listed on the intrasystem transfer summary form, yet Dr. Shearing did not renew this prescription when Plaintiff arrived at Menard, and Dr. Shearing offered absolutely no explanation as to why he made this decision (*see* Doc. 214; Doc. 214-2). With respect to the contact solution and contact case, Dr. Shearing indicated that he did not prescribe or provide these items because he was unaware that Plaintiff wore contacts (Doc. 214-2, ¶).[12] However, Nurse Rayburn wrote on the intrasystem transfer summary form that Plaintiff "has contacts" (Doc. 214-1, p. 1). Thus, it appears that Dr. Shearing either did not review that form in determining what medications and supplies Plaintiff needed, or he ignored

---

[12] There is no indication in the record as to how inmates are supposed to obtain contact solution and a contact case. More specifically, it is not clear whether a doctor must order those supplies. Plaintiff seems to think that a doctor must prescribe them. And, in fact, his medical records show that a contact case was prescribed to him by a physician after he returned to Stateville (Doc. 214-1, p. 22). Dr. Shearing does not dispute that he is the individual responsible for providing contact solution and a contact case to inmates who need them at Menard (*see* Doc. 214-2).

what it said. If Dr. Shearing read the form but simply missed seeing that Plaintiff wore contacts, his failure to prescribe the contact supplies would be mere negligence. If Dr. Shearing failed to review the form altogether, however, or if he reviewed it but simply ignored what it said, then a jury could conclude that Dr. Shearing's actions surpassed mere negligence and entered the realm of deliberate indifference. It is up to a jury to determine what happened and whether it constituted deliberate indifference.

For these reasons, the Court concludes that Nurse Butler and Dr. Shearing are not entitled to summary judgment on Count 1. In light of this conclusion, the Court must address Defendants' argument that they are protected by qualified immunity. "Generally, qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). In determining whether Defendants are entitled to qualified immunity, the Court must ask two questions: (1) whether the facts, taken in the light most favorable to Plaintiff, show that Defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Hernandez*, 634 F.3d at 914 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 202 (2001)).

Defendants' discussion on qualified immunity focused entirely on whether the defense is available to private medical providers like Nurse Butler and Dr. Shearing

(Doc. 214, pp. 22–24). Defendants obviously assert that they are entitled to invoke qualified immunity, but the Court doubts that is true. *See Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (noting that it was inclined to hold that medical personnel employed by a private company and contracted to provide medical care to inmates are categorically barred from asserting qualified immunity, but declining to definitively decide the issue); *but see Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 794 (7th Cir. 2014) (stating in *dicta* that "private prison employees are barred from asserting qualified immunity from suit under § 1983"), *cert. denied*, 135 S. Ct. 1024 (2015). *See also McCullum v. Tepe*, 693 F.3d 696, 701 (6th Cir. 2012) (holding that a doctor providing psychiatric services to inmates at a state prison is not entitled to assert qualified immunity).

Even if Defendants are, in fact, entitled to invoke qualified immunity, they have not explained why the defense is applicable. Accordingly, the Court declines to address whether Defendants are protected by qualified immunity. *Raghunathan v. Holder*, 604 F.3d 371, 378 (7th Cir. 2010) ("[S]tating blankly what one's argument *is* and actually *arguing* a position are different things."); *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003)("[I]t is not the obligation of this court to research and construct the legal arguments open to parties."). It is also worth mentioning that the Court cannot imagine how Defendants would be able to convincingly argue that Plaintiff's rights were not clearly established when it has long been held that jail personnel cannot simply ignore or unreasonably delay requests for medical attention and must respond appropriately. *See, e.g., Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) ("Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of

deliberate indifference."); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (finding that "[a]llegations of refusal to provide an inmate with prescribed medication or to follow the advice of a specialist can also state an Eighth Amendment claim"); *Johnson v. Doughty*, 433 F.3d 1002, 1013 (7th Cir. 2006) (noting that "medical personnel cannot simply resort to an easier course of treatment that they know is ineffective").

In sum, Nurse Butler and Dr. Shearing are not entitled to summary judgment on Count 1 or on the issue of qualified immunity.

### B.  Count 2: Equal Protection

In Count 2, Plaintiff alleges that Nurse Butler and Dr. Shearing violated his right to equal protection when they treated inmates on a temporary transfer to Menard differently than other inmates with regard to the delivery of medical care.

To state an equal protection claim, a plaintiff must establish that a state actor treated him differently from others similarly situated because of his membership in a particular class and that the state actor did so purposefully. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000) (citing *Washington v. Davis*, 426 U.S. 229, 239-42 (1976)). Discriminatory purpose "implies that the decision[-]maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group. *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982) (citation omitted).

Plaintiff has presented no evidence to support this claim. Specifically, Plaintiff has not pointed to any inmates arriving at Menard on a non-temporary basis who were treated differently than he was treated. Plaintiff also has not put forth any evidence that

Nurse Butler or Dr. Shearing singled out inmates temporarily housed at Menard for disparate treatment. Because Plaintiff's equal protection claim is wholly unsupported by any evidence, Dr. Shearing and Nurse Butler are entitled to summary judgment.

## C.   Count 3: Policy and Practice

In Count 3, Plaintiff alleges that Wexford, as a corporation, violated his Eighth and Fourteenth Amendment rights. Under controlling precedent, a private corporation that contracts to provide essential government services can be held liable under § 1983, but not under a theory of *respondeat superior*. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1024 (2015). The corporation can only be held liable if "the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Id.*; *see also Monell v. Dep't of Social Serv. of N.Y.C.*, 436 U.S. 658 (1978). In other words, the plaintiff must "show the existence of an official policy or other . . . custom that not only causes but is the moving force behind the deprivation of constitutional rights." *Teesdale v. City of Chicago*, 690 F.3d 829, 833-834 (7th Cir. 2012) (quotation marks and citations omitted).

Plaintiff claims that Wexford had a policy, which was implemented through Dr. Shearing, of denying prescription medication to inmates on temporary transfer away from their home institution. There is simply no evidence, however, that Wexford was the "moving force" behind the decision to discontinue Plaintiff's prescriptions. A Wexford official submitted an affidavit stating that "[t]he decision as to which medications are renewed, discontinued or changed when an inmate is transferred to a new facility is left to the professional discretion of the treating physician at that facility" (Doc. 214-5). And

Dr. Shearing stated in his own affidavit that he "was not following any particular . . . Wexford policy or procedure when determining which medications to prescribe for [Plaintiff]" (Doc. 214-2, ¶13). Plaintiff did not put forth any competent evidence to refute these affidavits. Plaintiff asserts that Dr. Shearing discontinued his medications at the behest of Wexford, but it is clear from Plaintiff's deposition testimony that this assertion is based on pure speculation and there is not any direct or circumstantial evidence to support it (*see* Doc. 214-3, p. 11). A plaintiff's speculation is insufficient to defeat a motion for summary judgment. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

To the extent that Plaintiff may also be arguing that Wexford has policies regarding costs, apportionment of profits, and financial incentives that led to the deprivation of constitutional rights, Plaintiff has not put forth any competent evidence to support his argument, and it is directly refuted by the affidavits from the Wexford official and Dr. Shearing (Doc. 214-2; Doc. 214-5).

In sum, no reasonable jury could conclude that Plaintiff's alleged constitutional injuries were caused by a Wexford policy, and Wexford is entitled to summary judgment on Count 3.

### D. Count 4: Retaliation

In Count 4, Plaintiff claims that Wexford denied him adequate medical care in retaliation for filing lawsuit and grievances against the corporation and its employees who are not parties to this action. At the summary judgment stage, a prisoner has the initial burden to make out a *prima facie* case of retaliation by showing that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation

likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014) (citing *Thayer v. Chiczewski,* 705 F.3d 237, 251 (7th Cir. 2012)).

Defendants do not make any argument related to the first and second elements; instead they focus on whether Plaintiff has satisfied the third element of his *prima facie* case (*see* Doc. 214, pp. 20–21). They argue that Plaintiff has not set forth any evidence showing that Dr. Shearing or Nurse Butler knew of his lawsuit or grievance history, that anyone made them aware of it, or that anyone acting on behalf of Wexford somehow influenced his care because of it (*Id.*). The Court agrees.

The medical decisions in this case were made by Dr. Shearing and Nurse Butler. Both men attest that during the time Plaintiff was at Menard, they had no knowledge or information that he had filed previous lawsuits against Wexford, its employees, or IDOC employees (Doc. 214-2, ¶10; Doc. 214-4, ¶9). They also didn't know about any grievances or complaints from Plaintiff regarding his medical care at other facilities (Doc. 214-2, ¶10; Doc. 214-4, ¶9). They further attest that no one from Wexford or the IDOC instructed them to treat Plaintiff differently because of previously filed lawsuits and grievances (Doc. 214-2, ¶11; Doc. 214-4, ¶11).

In rebuttal, Plaintiff points to a letter written by his attorneys in a different matter dated May 10, 2013, that stated that Plaintiff was not getting his medication at Stateville (Doc. 301-3, pp. 21-22). Plaintiff argues that this letter was located in his medical file and that Dr. Shearing and Nurse Butler would have seen it. This argument

is pure speculation—speculation that the letter was in his medical file, speculation that the letter was in the abbreviated file sent to Menard,[13] and speculation that Nurse Butler and Defendant Shearing saw the letter—which is insufficient to survive a motion for summary judgment. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

Because there is no evidence that Dr. Shearing and Nurse Butler knew of Plaintiff's litigation and grievance history, it could not have been a motivating factor in their decisions regarding Plaintiff's medical care. Consequently, Wexford is entitled to summary judgment on Count 4.

### E.   Count 6: Medical Malpractice

Count 6 is Plaintiff's medical malpractice claim under Illinois law. In the Court's threshold Order, Plaintiff was instructed that he had to submit an affidavit and certificate of merit as required by Illinois law in order to pursue his medical malpractice claim (Doc. 5). 735 ILL.COMP.STAT. § 5/2-622(a). Plaintiff was warned that Count 6 would be dismissed if Plaintiff did not file the required documents (Doc. 5). On April 17, 2014, Plaintiff filed an affidavit indicating that he made a request for his medical records but that he has not received them (Doc. 9). The fact that Plaintiff's medical records were not produced to him by the deadline did not excuse him from submitting a certificate of merit; it simply gave him more time to do so. 735 ILL.COMP.STAT. § 5/2-622(a)(3). Almost two more years have gone by since then, however, and Plaintiff still has not submitted the required certificate of merit. Accordingly, Count 6 against Defendants Shearing, Butler, Skidmore, and Malley is dismissed without prejudice.

---

[13] Both Dr. Shearing and Nurse Butler attest that, when inmates are temporarily transferred on court writs, their entire medical record is usually not transferred with them. Only an abbreviated medical record is sent. (Docs. 214-2, ¶12; Doc. 214-4, ¶12).

<u>C</u><small>ONCLUSION</small>

For the reasons set forth above, the Motion for Summary Judgment filed by Jeremy Butler, Robert Shearing, and Wexford on June 12, 2015 (Doc. 213) is **GRANTED in part and DENIED in part**. Summary judgment is **DENIED** as to Nurse Butler and Dr. Shearing on Count 1 (deliberate indifference claim), but **GRANTED** in their favor on Count 2 (equal protection claim). Summary judgment is **GRANTED** in favor of Wexford on Count 3 (deliberate indifference and equal protection claims) and Count 4 (retaliation claim). Additionally, Count 6 (medical malpractice claim) is **DISMISSED without prejudice** as to all Defendants

This case will proceed on the following counts against the Defendants as specified in each count:

**Count 1:** Eighth Amendment deliberate indifference claim against Defendants J. Butler, Skidmore, Malley, Shearing, K. Butler, and Harrington for refusing to provide Plaintiff with previously-prescribed medications and denying him access to a doctor;

**Count 2:** Fourteenth Amendment equal protection claim against Defendants Skidmore, Malley, K. Butler, and Harrington for refusing to provide Plaintiff with prescription medications based on his status as a prisoner on temporary transfer to Menard from his home institution; and

**Count 5:** Negligence claim under Illinois law against Defendants Malley, K. Butler, and Harrington for neglecting their duty to respond to Plaintiff's requests for prescription medications and to see a doctor.

The Court is mindful that certain claims disposed of in this Order are also asserted against other, non-moving Defendants. Those claims will be addressed when the Court takes up the Motion for Summary Judgment filed by Defendants Butler, Malley, Harrington, and Skidmore on November 30, 2015 (Doc. 303).

**IT IS SO ORDERED.**

**DATED:   March 29, 2016**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**