IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DAVID C. GEVAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 14-CV-134-NJR-DGW |
| | ) |
| DR. ROBERT SHEARING, | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| JEREMY BUTLER, | ) |
| RONALD SKIDMORE, | ) |
| NICKI MALLEY, KIMBERLY BUTLER, | ) |
| and RICHARD HARRINGTON, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Now pending before the Court is the Motion for Summary Judgment filed by Defendants Ronald Skidmore, Nicki Malley, Kimberly Butler, and Richard Harrington (Doc. 303). For the reasons explained below, the motion is granted in part and denied in part.

### INTRODUCTION

Plaintiff David Gevas, an inmate in the Illinois Department of Corrections at Stateville Correctional Center, filed a *pro se* civil rights action pursuant to 42 U.S.C. § 1983 on February 6, 2014. Plaintiff alleged that he was temporarily transferred to Menard Correctional Center for two weeks in August and September 2013, and during that time, he was deprived of various prescription medications and other items, including Neurontin for chronic pain in his left leg, Motrin for chronic pain in his left

shoulder, Flomax for an enlarged prostate and urination problems, Blink lubricating eye drops, multi-purpose solution for contact lenses, and a contact lens case. Plaintiff further alleged that as a result of these deprivations he suffered pain in his leg and shoulder, nausea, vomiting, insomnia, muscle jerking, frequent and uncontrollable urination, headaches, and the inability to see. He claimed that he made written and verbal requests for the items and to see a doctor, but those requests were denied by Defendants Jeremy Butler and Ronald Skidmore, who are both nurses at Menard. He further claimed that his grievances and complaints were ignored by Defendant Nicki Malley, the Health Care Unit Administrator; Kimberly Butler, the Assistant Warden; and Richard Harrington, the Warden. Plaintiff believes that the medications were denied in retaliation for a previous lawsuit and in an effort by Defendant Wexford Health Sources, Inc. ("Wexford") to save money. Plaintiff also believes that a portion of any money saved was funneled to Defendant Robert Shearing, a doctor at Menard.

Following a threshold review of the complaint pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on six counts:

**Count 1:** Eighth Amendment deliberate indifference claim against Defendants Jeremy Butler, Ronald Skidmore, Nicki Malley, Dr. Robert Shearing, Kimberly Butler, and Richard Harrington for refusing to provide Plaintiff with previously-prescribed medications and denying him access to a doctor;

**Count 2:** Fourteenth Amendment equal protection claim against Defendants Jeremy Butler, Ronald Skidmore, Nicki Malley, Dr. Robert Shearing, Kimberly Butler, and Richard Harrington for refusing to provide Plaintiff with prescription medications based on his status as a prisoner on temporary transfer to Menard from his home institution;

**Count 3:** Eighth Amendment deliberate indifference claim and Fourteenth Amendment equal protection claim against Wexford for promulgating a policy, practice, and custom of denying prescription medication to inmates on temporary transfer away from their home institution;

**Count 4:** First Amendment retaliation claim against Wexford for denying Plaintiff his necessary prescription medications because he previously filed a lawsuit against Wexford;

**Count 5:** Negligence claim under Illinois law against Defendants Nicki Malley, Kimberly Butler, and Richard Harrington for neglecting their duty to respond to Plaintiff's requests for prescription medications and to see a doctor;

**Count 6:** Medical malpractice claim under Illinois law against Defendants Dr. Robert Shearing, Kimberly Butler, Ronald Skidmore, and Nicki Malley for refusing to provide Plaintiff with his prescription medications or an examination by a doctor.

(*See* Doc. 5).

On June 12, 2015, Nurse Jeremy Butler, Dr. Robert Shearing, and Wexford ("the Wexford Defendants") filed a motion for summary judgment on Counts 1, 2, 3, 4, and 6 (Doc. 213). The Court concluded that a jury could find that Plaintiff's prostate problems, shoulder pain, leg pain, and the lack of contacts constituted serious medical conditions to which Dr. Shearing and Nurse Butler were deliberately indifferent (Count 1) (Doc. 318). Summary judgment was granted, however, in favor of Nurse Butler and Dr. Shearing on Plaintiff's equal protection claim (Count 2) and in favor of Wexford on Plaintiff's deliberate indifference and equal protection claims (Count 3) and retaliation claim (Count 4) (Doc. 318). Count 6 also was dismissed as to all Defendants (Doc. 318). In light of these rulings, the following claims remain:

**Count 1:** Eighth Amendment deliberate indifference claim against

                        Defendants Jeremy Butler, Ronald Skidmore, Nicki Malley, Dr. Robert Shearing, Kimberly Butler, and Richard Harrington for refusing to provide Plaintiff with previously-prescribed medications and denying him access to a doctor;

**Count 2:** Fourteenth Amendment equal protection claim against Defendants Ronald Skidmore, Nicki Malley, Kimberly Butler, and Richard Harrington for refusing to provide Plaintiff with prescription medications based on his status as a prisoner on temporary transfer to Menard from his home institution; and

**Count 5:** Negligence claim under Illinois law against Defendants Nicki Malley, Kimberly Butler, and Richard Harrington for neglecting their duty to respond to Plaintiff's requests for prescription medications and to see a doctor.

(*See* Doc. 318).

Defendants Ronald Skidmore, Nicki Malley, Kimberly Butler, Richard Harrington ("the IDOC Defendants") filed their own motion for summary judgment on November 30, 2015 (Doc. 303). There was a significant delay in Plaintiff responding to the motion because he was appointed counsel, and his deadline was extended more than once (Docs. 313, 323, 338). Plaintiff was finally able to file his response on December 12, 2016 (Doc. 345). The IDOC Defendants did not file a reply.

In the Court's previous summary judgment Order (Doc. 318), certain findings were made that are relevant to Plaintiff's claims against the IDOC Defendants. Neither Plaintiff nor the IDOC Defendants has challenged any of those findings. As such, those findings of fact are law of the case for purposes of the pending motion for summary judgment. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("Under this doctrine, the court should not reopen issues decided in earlier stages of the same litigation."). Those facts

will be repeated only to the extent needed to give context to the facts set forth by the IDOC Defendants. With that in mind, the following facts are undisputed except where noted.

### FACTUAL BACKGROUND

Plaintiff David Gevas was temporarily transferred from Stateville to Menard from August 21, 2013, to September 4, 2013. According to Plaintiff, at the time of his transfer, he had prescriptions for Neurontin, Motrin, Flomax, Depakote, Remeron, Benadryl, and Blink eye drops (*see* Doc. 214-3, p. 3). This information is corroborated by the Health Status Transfer Summary form, with two exceptions: the summary does not indicate that Plaintiff was taking Motrin, but it does indicate that he was taking an additional medication that he did not mention—Hytrin—which is used to treat prostate issues (Doc. 214-1, p. 1; Doc. 214-2, ¶¶5, 14). Plaintiff also testified that he wore soft contacts, for which he needed solution and a case (Doc. 214-3, p. 3).

The medical records show that when Plaintiff arrived at Menard on August 21st, he was screened at intake by nurses Christi Rayburn (who is not a defendant) and Defendant Jeremy Butler (*see* Doc. 214-1, p. 1; Doc. 214-4, ¶5). After the nurses completed the intake assessment of Plaintiff, Dr. Robert Shearing, the Medical Director at Menard, was contacted (Doc. 214-2, ¶9). Dr. Shearing prescribed Hytrin, Remeron, Depakote, and Benadryl for Plaintiff (Doc. 214-1, p. 20; Doc. 214-2, ¶9). Dr. Shearing did not re-prescribe the Neurontin, Motrin, Flomax, or the Blink eye drops. He also did not provide Plaintiff with contact solution or a case.

According to Dr. Shearing, inmates were instructed to use the sick call process if

they felt they needed medications other than the ones that were prescribed for them (Doc. 214-2, ¶17). "If the inmate follows the proper steps, sick call usually takes place within just a few days of arrival" (*Id.*). It is undisputed that an inmate should be seen within 72 hours of making a sick call request. The medical records show that, at his intake assessment on August 21st, the nurse check-marked the box for "routine" sick call (Doc. 214-1, p. 1). This notation does not mean that Plaintiff was automatically placed on the sick call list; it means that if Plaintiff wanted to be seen, he had to submit a sick call request (Doc. 304-7, p. 26).

The medical records indicate that Plaintiff was seen at nurse sick call by Nurse Ronald Skidmore on August 24th, where he stated that he needed his Flomax and Neurontin (Doc. 214-1, p. 3).[1] Plaintiff complained to Nurse Skidmore that he was experiencing nerve pain and frequent urination (*Id.*). It is undisputed that Nurse Skidmore noted on the progress report that he was referring Plaintiff to the doctor (*Id.*). Plaintiff testified that he told Nurse Skidmore that he was in a lot of pain. He indicated a ten on a ten-point scale with ten being the worst pain possible, but Nurse Skidmore, after stating that a ten was a broken bone, said that Plaintiff probably felt a seven to eight on such a scale (Doc. 214-3, p.15-16). Plaintiff further testified that Nurse Skidmore told him that Dr. Shearing discontinues "non-formulary" medication in order to save

---

[1] The medical record from the sick call indicates that Plaintiff complained he needed his "Flonase, Neurontin and Tramadol" (Doc. 214-1, p. 3). Plaintiff indicated at his deposition that he asked for "Flomax," but Nurse Skidmore mistakenly wrote down "Flonase" (Doc. 214-3, p. 16). Plaintiff claims that he also requested Ibuprofen, Blink contact eye drops, multipurpose solution, and a contact lens case from Nurse Skidmore (Doc. 345, pp. 30-31). The evidence cited, however, does not support this fact (*See* Doc. 345-2, p. 2).

money and recoup percentage (*Id.* p. 16).[2] That was the one-and-only contact Plaintiff had with Nurse Skidmore.

As previously noted, it is undisputed that when an inmate is referred to a doctor, medical directives indicate that he should be seen within 72 hours. According to Nurse Skidmore, someone from the medical records department was responsible for ensuring that Plaintiff was seen (Doc. 345-5, pp. 4, 5). That's because after Nurse Skidmore entered Plaintiff in the referral logbook, "medical records" was responsible for actually scheduling Plaintiff to see a doctor (*Id.*). Nurse Skidmore further testified that the nurses simply saw too many inmates at sick call to be able to follow-up and make sure that each inmate was in fact scheduled to see a doctor (*Id.*). It is undisputed that Plaintiff was never taken to the Health Care Unit or seen by a physician during the two weeks that he was at Menard (*see* Doc. 214-1).

The Health Care Unit Administrator ("HCUA"), Nicki Malley, has the "responsibility to ensure medical care services were provided for the inmates that were held at Menard" (Doc. 304-2, p. 7). During the relevant time period, Assistant Warden Kimberly Butler "oversaw the entire health care unit," ensuring that they complied with regulations and directives (Doc. 304-2, pp. 8-9).[3] And Warden Richard Harrington had the duty to review and respond to emergency grievances filed by inmates (Doc. 304-1,

---

[2] In particular, Plaintiff states "[Nurse Skidmore] said . . . [Dr. Shearing] discontinues these medications that are non-formulary and/or prescribed at another facility for purposes of money saved and that he gets a percentage of this money saved" (Doc. 214-3, p. 16). Plaintiff also states that Defendant Jeremy Butler told him that "Shearing has a practice and custom of discontinuing medication that is prescribed at another facility in order to save money and then he gets a percentage of this money saved" (Doc. 214-3, p. 9). Defendant Skidmore explained in his deposition that Menard did not recognize the prescriptions written by non-Menard physicians and had a policy of requiring a new prescription to be written by a doctor at Menard (Doc. 304-7, p. 19-20).

[3] Kimberly Butler is currently the Warden at Menard.

pp. 25-27). Warden Harrington, Assistant Warden Butler, and HCUA Malley had no direct contact with Plaintiff while he was at Menard (Doc. 304-1, p. 26; Doc. 214-3, p. 15; Doc. 345, p. 25). None of these Defendants recalls receiving or reading any correspondence or grievances from Plaintiff (Doc. 304-1, p. 26 (Harrington); Doc. 304-1, pp. 36-39 (Butler); Doc. 304-2, p. 40 (Malley)). It is undisputed that these Defendants indicate that if they did receive correspondence or grievances regarding lack of medical care they would have read it, contacted the Health Care unit, and made a determination on what to do with the correspondence/grievance (Doc. 304-1, p. 25-26 (Harrington); Doc. 304-2, pp. 30-31, 38 (Butler); *See* Doc. 304-3, pp. 54-55 (Malley)).

As Plaintiff tells it, however, he wrote to HCUA Malley "many times" about his medications, but nothing was done (Doc. 214-3, p. 15). Plaintiff also wrote three emergency grievances—on August 23rd, 25th, and 29th (Doc. 214-3, p. 16-17; Doc. 304-5, p. 4; Doc. 304-6, p. 3). Only the first one was documented as received by the Warden; it was deemed a non-emergency and returned to Plaintiff (*see* Doc. 57, pp. 5, 6). Plaintiff also sent four or five "kites" (Doc. 214-3, p. 17). Plaintiff does not have copies of the grievances, kites, or letters but states that they contained "the same thing that was written in the grievance" (Doc. 214-3, p. 17). It is undisputed that these documents concerned Plaintiff's lack of medication that forms the basis of this suit (*See* Doc. 51-1, pp. 1-5). Plaintiff delivered these documents by placing them in the bars of his cell or dropping them in a sick call box in the gallery (Doc. 214-3, p. 17). Plaintiff believes that if the Warden received the emergency grievance, Defendants must have received his other correspondence because they all go through the same mail system (Doc. 214-3, p. 18).

## DISCUSSION

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

**A. Count 1: Deliberate Indifference**

In Count 1, Plaintiff alleges that Nurse Skidmore, HCUA Malley, Assistant Warden Butler, and Warden Harrington were deliberately indifferent to his medical needs when they refused to provide him with previously prescribed medications and denied him access to a doctor, causing him to suffer pain and physical discomfort, in violation of the Eighth Amendment.

In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Second, the plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *Greeno*, 414 F.3d at 653.

The Court previously concluded that Plaintiff's chronic leg and shoulder pain, prostate problems, and lack of functioning contact lenses constituted serious medical needs (Doc. 318). The IDOC Defendants do not dispute this finding. The Court must now decide whether Nurse Skidmore, Wardens Butler and Harrington, and HCUA Malley acted with deliberate indifference to those medical needs.

In order to show that prison officials acted with a sufficiently culpable state of mind, a plaintiff must put forth evidence that the prison officials knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution.").

### 1. Nurse Ronald Skidmore

In order for a medical professional to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Holloway*, 700 F.3d at 1073; *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). In other words, a prison medical professional is "entitled to

deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain*, 512 F.3d at 894–95). *See also Holloway*, 700 F.3d at 1073 ("There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." (quoting *Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir. 2008))).

Here, Nurse Skidmore saw Plaintiff one time at a sick call on August 24th. The nurse evaluated Plaintiff's condition, noted that Plaintiff was seeking his medication, and took the only step he could take in order to achieve that goal—he referred Plaintiff to the doctor. Nurse Skidmore did not ignore the risk to Plaintiff's health and took steps to ensure that he would receive care.

Plaintiff seems to suggest that Nurse Skidmore should have done more, but it is unclear to the Court what more Nurse Skidmore could have done. Plaintiff also seems to suggest that Nurse Skidmore's actions were illusory in light of his belief that Dr. Shearing may not have prescribed the medication upon intake because of self-interest. The evidence on this point is sketchy at best—Plaintiff testifies that Nurses Butler and Skidmore told him that Dr. Shearing discontinues non-formulary medication upon intake in order to save money and pocket a bonus. Even if a jury believed Plaintiff's testimony, there is no evidence that Nurse Skidmore thought Dr. Shearing would maintain his refusal to prescribe medication even in the face of the nurse's report. In other words, there is no evidence that Nurse Skidmore referred Plaintiff to Dr. Shearing even though he knew the referral was futile. Speculation to this effect cannot defeat a

motion for summary judgment. *Stephens v Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (noting that "inferences relying on mere speculation or conjecture will not suffice"). Accordingly, Nurse Skidmore is entitled to summary judgment on Count 1.

**2. HCUA Malley, Assistant Warden Butler, and Warden Harrington**

Non-medical defendants, like Malley, Butler, and Harrington, are entitled to rely on the medical judgment of medical personnel. *Greeno v. Daley*, 414 F.3d 645, 655-656 (7th Cir. 2005) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004)). However, while they may rely on the competence of prison doctors, they still "cannot simply ignore an inmate's plight." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *see also Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). If Plaintiff's communication to these Defendants "in its content and manner of transmission, gave the prison official[s] sufficient notice to alert him or her to 'an excessive risk to inmate health or safety,'" they can be found to be deliberately indifferent to Plaintiff's serious needs. *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. 837).

Plaintiff testified that he sent these Defendants letters, kites and emergency grievances through the prison mail system, indicating that he was not receiving necessary medication that would prevent pain and incontinence. Defendants deny ever receiving these communications. If they received the communications but took no action, then a jury could find them deliberately indifferent. Resolving whether the Defendants received Plaintiff's letters, kites, and/or grievances requires the Court to make a credibility determination. But the Court cannot decide on summary judgment

whether Defendants' testimony is believable; a jury must make that decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

Consequently, Defendants Malley, Butler, and Harrington are not entitled to summary judgment on Count 1. In light of this conclusion, the Court must address Defendants' argument that they are protected by qualified immunity.

"Generally, qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). In determining whether Defendants are entitled to qualified immunity, the Court must ask two questions: (1) whether the facts, taken in the light most favorable to Plaintiff, show that Defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Hernandez*, 634 F.3d at 914 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 202 (2001)).

As set forth above, Plaintiff has set forth enough facts for a jury to find that Malley, Butler, and Harrington violated his constitutional rights. And, as further set forth above, it has long been held that jail personnel cannot simply ignore an inmate's complaints about inadequate medical care. *Figgs*, 829 F.3d at 903; *Arnett*, 658 F.3d at 755; *Berry*, 604 F.3d at 440; *Vance*, 97 F.3d at 993. Accordingly, these Defendants are not entitled to qualified immunity.

### B. Count 2: Equal Protection

In Count 2, Plaintiff alleges that Defendants Skidmore, Malley, Butler, and Harrington violated his right to equal protection when they treated inmates on a temporary transfer to Menard differently than other inmates with regard to the delivery of medical care.

For the reasons set forth in this Court's previous Order (Doc. 318), Plaintiff has failed to come forth with any evidence to support this claim. Specifically, Plaintiff has not pointed to any similarly situated inmate who was treated differently, which is a basic requirement for prevailing on an equal protection claim. *See Chavez v. Illinois State Police*, 251 F.3d 612, 636 (7th Cir. 2001); *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). Accordingly, Defendants Skidmore, Malley, Butler, and Harrington are entitled to summary judgment on Count 2.

### C. Count 5: Negligence

Under Illinois law, tort claims against state officers for conduct arising out of their state employment are subject to dismissal in state and federal court on the basis of sovereign immunity. *See Turner v. Miller*, 301 F.3d 599, 602 (7th Cir. 2002). Sovereign immunity generally bars lawsuits against the government unless the government consents to be sued. *Jackson v. Alvarez*, 831 N.E.2d 1159, 1163 (Ill. App. Ct. 2005). Plaintiff has conceded that this count should be dismissed without prejudice (Doc. 347), and it will not be addressed further.

CONCLUSION

For the reasons set forth above, the motion for summary judgment filed by Defendants Ronald Skidmore, Nicki Malley, Kimberly Butler, and Richard Harrington (Doc. 303) is **GRANTED in part and DENIED in part**. On Count 1, summary judgment is **GRANTED** as to Defendant Skidmore and **DENIED** as to Defendants Malley, Butler, and Harrington. On Count 2, summary judgment is **GRANTED** as to Defendants Skidmore, Malley, Butler, and Harrington. Count 2 is **DISMISSED with prejudice** in its entirety. And Count 5 is **DISMISSED without prejudice**.

This matter will proceed to trial on Count 1 for deliberate indifference against Defendants Jeremy Butler, Nicki Malley, Kimberly Butler, and Richard Harrington. A Final Pretrial Conference before the undersigned is set for **February 22, 2017,** at **9:30 a.m.** and a Jury Trial is set for **March 21, 2017,** at **9:00 a.m.**

Magistrate Judge Donald G. Wilkerson is **DIRECTED** to set a telephonic conference prior to the Final Pretrial Conference.

**IT IS SO ORDERED.**

DATED:   February 1, 2017

**NANCY J. ROSENSTENGEL**
**United States District Judge**